UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

RICKY THOMAS DELORENZO,

                          Plaintiff,        **No. 6:15-cv-06532(MAT)**
                                            **DECISION AND ORDER**

          -vs-

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                          Defendant.

---

## INTRODUCTION

Represented by counsel, Ricky Thomas DeLorenzo, ("Plaintiff") brings this action pursuant to Titles II and XVI of the Social Security Act, challenging the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).

## PROCEDURAL STATUS

On May 2, 2012, Plaintiff filed applications for DIB and SSI, alleging disability beginning February 14, 2011. After the applications were denied, Plaintiff requested a hearing, which was held before Administrative Law Judge John P. Costello ("the ALJ") on February 19, 2014, in Rochester, New York. See T.40-76.[1]

---

[1]

Numbers preceded by "T." refer to pages from the administrative transcript, filed electronically by Defendant.

Plaintiff appeared with his attorney and testified, as did an impartial vocational expert. On March 21, 2014, the ALJ issued an unfavorable decision, <u>see</u> T.19-33. The Appeals Council denied Plaintiff's request for review on July 13, 2015, making the ALJ's decision the final decision of the Commissioner. This timely action followed.

The parties have cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons that follow, the Court reverses the Commissioner's decision and remands the case for further administrative proceedings.

### SUMMARY OF RELEVANT EVIDENCE

### I.   Evidence Prior to the Onset Date of February 14, 2011

Plaintiff, a high school graduate, was forty-three years old on the onset date, and forty-six years old on the date of the hearing. In 2006, Plaintiff was involved in a motor vehicle accident which he states was the origin of his ankle, back, and neck pain. Plaintiff was employed as a cashier (light exertional level work) for at least three years following the accident, but was terminated for excessive absenteeism. After that, he collected unemployment benefits until his benefits were exhausted.

Prior to the alleged onset date, Plaintiff sought treatment in February, March, June, and December of 2009, from his primary care physician, Dr. Robert Caifano, and physician's assistant Frances

Noble, RPA-R ("P.A. Noble"), primarily for hypertension. <u>See</u> T.316-26. The treatment notes do not record any complaints of pain, but prescriptions for Oxycontin and oxycodone were given. <u>See</u>, <u>e.g.</u>, T.338-39; 318-19; 320. On December 9, 2009, Dr. Caifano changed Plaintiff's oxycodone dosage from 10 mg, every 4 hours, to 15 mg, 3 times a day. Plaintiff was given a prescription for Oxycontin (20 mg), which he took once a day; this was the same dosage as previously, but in a sustained release form of the medication. P.A. Noble stated that Plaintiff had been discharged from the pain clinic[2] because routine urine screening indicated positive results for morphine-based narcotics (dilaudid), which was a breach of the patient-provider contact. <u>See</u> T.320, 356 (results of a blood and urine test ordered by Rochester Brain & Spine Neurosurgery & Pain Management on November 11, 2009; handwritten note states, "Pt has other controlled meds in U.D.T. [sic]. Needs to be dismissed").

On March 20, 2009, Plaintiff underwent a triple arthrodesis (surgical immobilization) of his left ankle. X-rays taken June 9, 2009, showed the arthrodesis was stable. T.396.

In March, July, August, September, October, and December 2010, Plaintiff had appointments with Dr. Caifano and his physician's assistant; these were generally for his hypertension and some panic

---

[2] There are no treatment notes from the pain clinic in the record, and Plaintiff has not argued that the record is incomplete without them, presumably because they precede the onset date by several years.

attacks and generalized anxiety. <u>See</u>, <u>e.g.</u>, T.322, 323. On July 12, 2010, Dr. Caifano increased his oxycodone dosage to 15 mg 3 to 4 times a day; the Oxycontin dosage remained the same. On August 4, 2010, he complained of "chronic ankle pain worsened by activities" but "no unusual swelling or severe pain." T.323. On September 1, 2010, it was noted that Plaintiff's pain control was "definitely adequate." T.324.

On February 11, 2011, Plaintiff saw Dr. Caifano following a motor vehicle accident several days earlier in which his car was rear-ended by a pick-up truck. Since then, he had been experiencing neck spasms and triggers. Dr. Caifano diagnosed Plaintiff with cervicalgia and whiplash, referred him to a chiropractor, and increased his oxycodone dosage. T.327.

## II.  Evidence After the Onset Date of February 14, 2011

On February 17, 2011, Plaintiff reported to chirpractor Colby Shores, D.C., at Chiropractic Associates of Rochester complaining of pain in his back and neck that felt as though he had been hit with a sledge hammer. He reported his pain was 7/10 at best, 10/10 at worst, and 10/10 during that exam. Plaintiff completed the Neck Disability Index questionnaire, indicating that it was painful to look after himself, he had to move slowly and carefully, he could only lift very light weights, could not do any work at all, had slight headaches that came infrequently, had a lot of difficulty concentrating, his sleep was greatly disturbed for up to 3-5 hours,

that he could not read as much as he wanted because of moderate neck pain, that he could hardly do recreational activities due to neck pain, the pain prevented him from sitting for more than 10 minutes, the pain prevented him from standing at all, he had less than 4 hours of sleep because of the pain, his sex life was restricted by pain, he could drive as long as he wanted with moderate neck pain, but the pain restricted him to short necessary journeys under 30 minutes. T.388-89. On examination, Plaintiff had decreased cervical flexion, extension, rotation, and lateral flexion, and decreased thoracic lumbar flexion, extension, rotation, and lateral flexion. Plaintiff treated with Dr. Shores twice in February, 9 times in March, 8 times in April, and 8 times in May of 2011. In May 2011, Dr. Shores decreased Plaintiff's visits from 3 times per week to twice a week because he was showing improvement from his initial visit. Plaintiff treated with Dr. Shores 7 times in June, 4 times in July, twice in August, 4 times in September, once in November, and 3 times in December of 2011. See T.371-84. Plaintiff continued to complain of 5/6 right neck pain that was 5/6 at best and 6/6 at worst and 8/10 mid to low back pain that was 6/10 at best and 10/10 at worst and interfered with sleep, and was treated with therapeutic exercises.

Plaintiff returned to his primary care physician Dr. Caifano on March 1, 2011, with continued spasms in the cervical area to lower back. T.328-29. However, "improvement was noted" after 6

visits with Dr. Shores, and the addition of Flexeril at night. On examination, Plaintiff had limited right shoulder flexion, extension, and abduction; limited left shoulder flexion, extension, and abduction; decreased flexion, extension, right rotation, left rotation, right bending, and left bending in the low back with tenderness.

Plaintiff saw Dr. Caifano twice in April 2011, complaining of cervicalgia on the right side with head-turning, as well as low back pain, which caused him to stay indoors one day per week and slowed all activities of daily living. On examination, Plaintiff appeared to be in mild pain; had decreased flexion in the neck with tenderness and spasms; had decreased low back flexion, extension, rotation, right bending, and left bending; and had low back tenderness and spasms. T.330.

On April 4, 2011, Plaintiff underwent x-rays of the cervical and lumbar spine which revealed no fractures in those regions. T.403. The vertebrae were normally configured and aligned, though there was mild spurring anteriorly at L5, mild disc space narrowing at L4-5, and a slight pelvic tilt. Prevertebral soft tissues were unremarkable.

At his appointment with Dr. Caifano on April 29, 2011, Plaintiff complained of continued ankle, neck, and low back pain. T.331. Examination revealed decreased flexion, extension, right rotation, left rotation, and bending in the neck; tenderness and

spasms in the neck; decreased flexion, extension, right and left rotation in the low back; and diffuse tenderness over the lumbosacral paraspinal areas and the pericervical muscles, with spasms and tension. T.331. Dr. Caifano assessed range of motion limitations and noted that Plaintiff had "considerable" side effects from his pain medications, namely, concentration difficulties and sedation. T.331. Dr. Caifano commented, "I don't [see] him capable of working in any capacity. . . . " Id.

Plaintiff saw Dr. Caifano again on May 23, 2011; July 13, 2011; and October 3, 2011, with regard to continued pain following the February 2011 motor vehicle accident. The clinical findings on examination were largely unchanged. At the October 3, 2011 appointment, Dr. Caifano increased Plaintiff's oxycodone dosage to 15 mg, 5 times a day; his Oxycontin prescription, which was the maximum (20 mg, once a day), remained the same. On July 13, 2011, Dr. Caifano noted that Plaintiff's pain control had improved on the current analgesic schedule, i.e., Oxycontin and oxycodone, with "no break thru issues[.]" T.333. Dr. Caifano indicated that Plaintiff should "[c]ont[inue] the present meds" and noted that "he is most likely dependent and atolerant [sic] at the time to these narcotics and [functions] with taking 5 hr energy drinks and occasional caffeinated beverages to [do] [activities of daily living]." T.333. At the October 3, 2011, appointment, Plaintiff reported that his pain control with medications was marginally to moderately

effective. T.334.

On February 13, 2012, Plaintiff followed up with Dr. Caifano, complaining of "much more progressive" pain in his ankles—despite analgesics, rest, and elevation—which "severely compromis[ed]" his activities of daily living, and his rest/sleep. T.336. Plaintiff was taking Oxycontin, oxycodone, and Flexeril for his pain. The only clinical examination findings were "ROM loss" and "mild swelling" although it is not noted whether this is bilaterally in the ankles. T.336-37. Because his narcotics were "maximized," Dr. Caifano noted that Plaintiff would need a consultation with a pain management specialist.

At a September 5, 2012 appointment with Dr. Caifano, Plaintiff presented complaining of groin pain of unknown cause. Dr. Caifano increased Plaintiff's oxycodone dosage to 15 mg every 4 hours (maximum daily dosage of 6 tablets). T.436. Dr. Caifano did not perform a musculoskeletal exam.

Plaintiff saw Dr. Caifano again on February 19, 2013, in follow up for his hypertension. Plaintiff reported "extreme agitation" about "life[,] relationship[,] finances, stressors in general." T.439. Dr. Caifano included an addendum stating, "[O]f note his appearance is well composed, he is NOT in any discernable pain overtly to me and his gait is non antalgic[.]" T.439 (emphasis in original). On exam, Dr. Caifano noted that the right ankle had minimal swelling over the medial malleolar area with some direct

-8-

tenderness; range-of-motion was 50% in all planes. Dr. Caifano indicated that Plaintiff's pain medications were "maxed" and that he had "no response to aggressive NSAIA [sic]." T.439.

On March 7, 2013, Plaintiff had an x-ray of his right foot, ordered by Dr. Caifano, which revealed an old fracture deformity at the ankle with internal hardware in place and post-traumatic arthrosis of the talcrural. T.418. There was no substantial interval progression of talocrural arthrosis and no acute findings. T.419. X-rays of the left foot taken that day showed an essentially mature triple arthrodesis; there was mild degenerative changes of the midfoot joints, with minimal progression observed at the navicular first tarsal articulation. T.420. The ankle joint was unremarkable, and no interval complication was noted. T.421.

X-rays of Plaintiff's lumbosacral spine on April 30, 2013, ordered by Dr. Caifano, showed minimal degenerative changes of the lumbar spine; the lumbar vertebral body heights and alignment were maintained, as were the disc space heights. T.422.

On April 26, 2013, Plaintiff saw Dr. Caifano complaining of "good days and bad days dep[ending] on weather and activities." T.440. Dr. Caifano referenced a "recent car accident" on an unspecified date which had "resulted in significant myalgias and arthralgias of the back[;] and he "still require[d] around the clock narcotics" but was having no new issues or erythema as long as he rested for a day following activities. T.440. On examination,

there was minimal swelling of the right ankle, some direct tenderness, and range of motion was decreased by 50% in all planes. T.440-41. Plaintiff said that his low back pain was worsening since the accident, with stiffness and range of motion loss. T.441. Given his current narcotic load, Dr. Caifano could not prescribe anything other than Flexeril. T.441. Dr. Caifano referenced a "late effect of leg fracture" and stated the limitations are "noteworthy but stable" and his "meds [were] effective." T.441.

Plaintiff followed up with Dr. Caifano on May 31, 2013, with regard to his hypertension. He was still taking Flexeril, oxycodone, and Oxycontin for his pain. Plaintiff attributed the success of his hypertension treatment to the increased dosage of an anxiolytic drug, lorazepam. T.443. Dr. Caifano indicated that he could not argue with that, given that Plaintiff was "one of the most nervous individuals" he had ever met. Id.

On August 28, 2013, Dr. Caifano noted that Plaintiff's leg, back, and foot pain continued but were "no worse[.]" T.451. Plaintiff reported he was unable to stand or walk more than 15 minutes at a time, that he lived with his mother who was the "adl [activities of daily living] provider," and that he has no capacity to do "any outdoor work or adls." His pain baseline was about 4-6/10 in the ankles, with persistent edema; and about 3-5/10 in the lower back, as well as daily anxiety and depression due to his health and financial problems. T.451. He had numerous trigger

points over the legs and low back. T.451-52. Dr. Caifano opined that "all [of Plaintiff's] problems had virtually NO chance for any improvement." T.452 (emphasis in original).

Plaintiff returned to Dr. Caifano on November 26, 2013, and complained of chronic low back pain and diffuse arthralgias of the low back, ankle, and knee. T.468. He reported "decent to good" control of his pain with his narcotic medications. However, there continued to be some degree of chronic lower back pain and diffuse arthralgias of the lower back, ankle, and knee. On examination he was in no apparent distress, and his neurological examination was normal. Dr. Caifano did not conduct a musculoskeletal examination. Plaintiff was continued on his current medications. T.468-69.

On February 3, 2014, Plaintiff returned to Dr. Caifano, who noted he was "very anxious" about "a lot of things." Review of systems was positive for fatigue. He was assessed with anxiety state, unspecified. T.473-78. Plaintiff was continued on the same dosage of oxycodone and Oxycontin.

### THE ALJ'S DECISION

Applying the Commissioner's five-step sequential evaluation for adjudicating disability claims, see 20 C.F.R. §§ 404.1520, 416.920, the ALJ found, at step one, that Plaintiff meets the insured status requirements of the Act through March 31, 2015, and has not engaged in substantial gainful activity since February 14, 2011, the alleged onset date. At step two, the ALJ found that

Plaintiff has the following severe impairments: status post-ankle fracture, right;[3] lumbar and cervical disc disease; adjustment disorder with mixed anxiety and depressed mood; anxiety; panic disorder without agoraphobia; low average intelligence; and asthma. At step three, the ALJ determined that none of Plaintiff's severe impairments, considered singly or in combination, met or medically equaled a listed impairment, including Listings 1.02 (Major dysfunction of a joint), 1.03 (Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint), (1.04 Disorders of the spine), 3.03 (Asthma), 12.04 (Affective disorders), and 12.06 (Anxiety-related disorders). See T.22-25.

The ALJ assessed Plaintiff with the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), with "the following specification: the claimant is limited to simple tasks; should be given the opportunity to briefly stand and stretch after sitting for 45 minutes; and should avoid respiratory irritants." T.25.

At step four, the ALJ found that Plaintiff could not perform his past relevant work as a cashier/checker, production assembler, or salesperson. At step five, the ALJ relied on the vocational expert's testimony to find that there were sedentary, unskilled jobs in the national economy that Plaintiff could perform, such as

---

[3]

The ALJ omitted inclusion of Plaintiff's status post-ankle fracture, left, as a severe impairment at step two, but Plaintiff has not raised this argument on appeal.

addresser and order clerk (food and beverage industry). Accordingly, the ALJ entered a finding of not disabled.

## SCOPE OF REVIEW

When considering a claimant's challenge to the decision of the Commissioner denying benefits under the Act, the district court is limited to determining whether the Commissioner's findings were supported by substantial record evidence and whether the Commissioner employed the proper legal standards. Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003). The district court must accept the Commissioner's findings of fact, provided that such findings are supported by "substantial evidence" in the record. See 42 U.S.C. § 405(g) (the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive"). The court nevertheless must scrutinize the whole record and examine evidence that supports or detracts from both sides. Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1998) (citation omitted). "The deferential standard of review for substantial evidence does not apply to the Commissioner's conclusions of law." Byam v. Barnhart, 336 F.3d 172, 179 (2d Cir. 2003) (citing Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984)).

## DISCUSSION

I. **Plaintiff claims that the RFC assessment is not supported by substantial evidence and that the ALJ committed errors in weighing of medical expert opinions.**

   **A. Legal Principles**

"[T]he treating physician rule generally requires deference to the medical opinion of a claimant's treating physician[.]" Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (internal and other citations omitted). A corollary to the treating physician rule is the so-called "good reasons rule," which is based on the regulations specifying that "the Commissioner 'will always give good reasons'" for the weight given to a treating source opinion. Halloran, 362 F.3d at 32 (quoting 20 C.F.R. § 404.1527(d)(2); citing 20 C.F.R. § 416.927(d)(2); citation omitted). "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific . . . .'" Blakely v. Commissioner of Social Sec., 581 F.3d 399, 406 (6th Cir. 2009) (quoting SSR 96-2p, 1996 WL 374188, at *5 (S.S.A. July 2, 1996)). An ALJ's "'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based on the record[,]'" Blakely, 581 F.3d at 407 (quotation omitted; emphasis in original).

Where controlling weight is not accorded to a treating physician's opinion, the ALJ "must consider various 'factors' to determine how much weight to give to the opinion[,]" id. (quoting 20 C.F.R. § 404.1527(d)(2)), such as "(i) the frequency of examination and the length, nature and extent of the treatment

-14-

relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.'" Id. (quoting 20 C.F.R. § 404.1527(d)(2)).

"Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." Hilsdorf v. Comm'r of Soc. Sec., 724 F. Supp.2d 330, 347 (E.D.N.Y. 2010) (citing Woodford v. Apfel, 93 F. Supp.2d 521, 529 (S.D.N.Y. 2000) ("An ALJ commits legal error when he makes a residual functional capacity determination based on medical reports that do not specifically explain the scope of claimant's work-related capabilities."); Zorilla v. Chater, 915 F. Supp. 662, 666-67 (S.D.N.Y. 1996) ("The lay evaluation of an ALJ is not sufficient evidence of the claimant's work capacity; an explanation of the claimant's functional capacity from a doctor is required.")); see also, e.g., Legall v. Colvin, No. 13 CV 1426 VB, 2014 WL 4494753, at *4 (S.D.N.Y. Sept. 10, 2014) (collecting cases).

### B.   Dr. Caifano's Opinion

On August 28, 2013, Dr. Caifano completed a physical RFC questionnaire for Plaintiff, T.446-50, whom he had treated 2 to 3

times per month since 2004. Dr. Caifano indicated that Plaintiff
had been diagnosed with 2 ankle fractures following 2 motor vehicle
accidents and had chronic bilateral ankle, foot, and lower leg
pain, and back pain that caused an inability to stand for more than
15 minutes at a time. T.446. Dr. Caifano indicated Plaintiff's
impairment had lasted or could be expected to last at least 12
months. Emotional factors contributed to the severity of
Plaintiff's symptoms and functional limitations; in particular,
Plaintiff's depression and anxiety negatively affected his physical
condition. T.447.

Dr. Caifano opined that Plaintiff's pain and other symptoms
would frequently interfere with the attention and concentration
needed to perform even simple work tasks, and that Plaintiff was
incapable of even low stress jobs because he was physically unable
to stand or walk more than 15 minutes at a time. T.447. Dr. Caifano
stated that Plaintiff could not walk a city block without needing
to rest or experiencing severe pain, could only sit for 15 minutes
at a time before needing to get up, and could stand for 15 minutes
at one time before needing to sit down or walk around. T.447.
Plaintiff could sit and stand/walk for less than 1 hour total in an
8-hour workday, and needed a job that permitted shifting positions
at will from sitting, standing, and walking. He would sometimes
need to take unscheduled 30-minute breaks during an 8-hour workday.
If sitting for a prolonged period, he should elevate his legs above

hip level. T.448. Dr. Caifano opined that Plaintiff could "never" lift even less than 10 pounds, could never twist, could rarely stoop and crouch/squat, and could occasionally climb stairs and look down. T.448-49. Dr. Caifano indicated that Plaintiff's impairments would always produce "bad days." T.449. In conclusion, Dr. Caifano noted that Plaintiff's "depression/anxiety are correlated to increased muscle spasms and bad days; also narcotics cause sedation side effects." T.450.

### C.   Dr. Shores' Other Source Opinion

In a physical residual functional capacity ("RFC") report dated May 25, 2012, chiropractor Dr. Shores opined that Plaintiff was able to lift and carry 20 pounds occasionally, stand and/or walk for up to 6 hours per day, and sit for up to 6 hours per day. Dr. Shores stated that Plaintiff does have an occasional limp in his gait when he is sore but, according to Dr. Shores, does not require an assistive device to walk.

### D.   The ALJ's Weighing of the Medical Expert Opinions

While recognizing that Dr. Caifano was Plaintiff's treating physician, the ALJ only accorded his assessments "little weight," because the ALJ found that "they are not supported by the claimant's treatment records, which show some periods of exacerbation, but generally show [Plaintiff]'s pain to be under reasonable to good control . . . ." T.28. The ALJ noted that the day Dr. Caifano offered his RFC assessment, August 28, 2013, was a

-17-

period of exacerbation; Plaintiff stated that he could not perform any outdoor activities, was experiencing depression and anxiety daily, and had multiple abnormal examination findings such as decreased range of motion and some edema in his ankles. See T.451-52. The ALJ went on to note that the August 28, 2013 visit to Dr. Caifano was "the only one where [Plaintiff] is noted to appear uncomfortable and in mild pain[,]" yet "[a]n exam just three months later finds [Plaintiff] to be in no apparent distress and confirms normal neurologic findings with no indication of the severe restrictions discussed in the prior report." T.28. Specifically, on November 26, 2013, Dr. Caifano noted that Plaintiff had "decent to good" control of his pain with oxycodone, Oxycontin, and Flexeril. T.451-52. Dr. Caifano did not perform a musculoskeletal exam and noted that Plaintiff was in no apparent distress. T.452. Dr. Caifano stated that he would not further adjust Plaintiff's medications "as his narcotics are adequate and other meds have failed." T.469.

The Court nevertheless cannot find that the ALJ adequately explained why Dr. Shores' other-source report should be given controlling weight over Dr. Caifano's treating-source statement. Dr. Caifano clearly had a longer treating relationship with Plaintiff, and while he is not a specialist in the area of orthopedics, neither is Dr. Shores. In Diaz v. Shalala, the Second Circuit held that "a chiropractor's opinion is not covered by th[e]

-18-

[treating physician] rule" since "a treating source's opinion . . . must be a medical opinion." 59 F.3d 307, 309, 313 (2d Cir. 1995). Although Dr. Shores treated Plaintiff on multiple occasions, his treatment notes are extremely cursory; at least 4 visits are recorded on one page. Each treatment note consists of a chart with boxes corresponding to a patient's vertebrae, in which Dr. Shores has placed a mark or a letter. For each visit, Dr. Shores wrote at most a few sentences, and most of these entries are illegible. It is impossible to determine whether Dr. Shores' RFC assessment comports with his treatment notes, because his treatment notes are so sparse. In effect, the ALJ appeared to reject Dr. Caifano's opinion solely because of a perceived inconsistency with his own treatment notes. However, the ALJ cherry-picked evidence from Dr. Caifano's treatment notes favoring a finding of not disabled, which is improper. See, e.g., Tim v. Colvin, No. 6:12-CV-1761 GLS/ESH, 2014 WL 838080, at *7 (N.D.N.Y. Mar. 4, 2014) (ALJ failed to comply with "good reasons" rule where ALJ "cherry-picked evidence from [treating source]'s treatment records" and "discredited [treating source]'s opinions regarding mental limitations based on only two isolated instances where [treating source]'s records failed to note marked psychiatric symptoms, while ignoring all the other instances where serious symptoms were documented").

The only other expert medical opinion from an acceptable source was from consultative physician Harbinder Toor, M.D., who

examined Plaintiff on August 10, 2012, at the Commissioner's request. See T.288-95. At the examination, Plaintiff used a cane, which he stated was prescribed by his doctor. Dr. Toor noted that Plaintiff was in "moderate pain" and walked with an abnormal limping gait toward the right, with and without the cane. T.289. Plaintiff declined to heel-toe walk or to squat, and declined to lie down on the examination table. Plaintiff had difficulty rising from the chair but needed to help changing for the exam. There was tenderness, pain, and swelling in the right ankle, and slight tenderness and swelling in the left ankle. T.290-91. Plaintiff reported continued pain in the ankles, more severe on the right than the left, radiating to the knees, due to injuries sustained as a result of motor vehicle accidents in 2006, and February 2011. Plaintiff also reported pain in lower back and cervical pain radiating to the arms, sometimes with associated numbness and tingling in the hand, as well as headaches off and on from the cervical spine pain. Plaintiff said he has difficulty standing, walking, squatting, sitting, bending, lifting, pushing, pulling, reaching, grasping, and holding, as well as occasional problems twisting the cervical spine. Plaintiff declined to perform the supine or sitting straight-leg-raising tests on either side; he also refused to perform the hip range-of-motion test on either side. T.290. For his medical source statement, Dr. Toor opined that Plaintiff had "moderate to severe" limitations in standing,

walking, squatting, bending, and lifting; "moderate" limitations in sitting a long time; and "mild to moderate" limitations in reaching or twisting of the cervical spine. T.291-92. Dr. Toor stated Plaintiff's prognosis was "guarded" and that pain and headaches could interfere with Plaintiff's routine. T.292. The ALJ purported to give this opinion "significant" weight in concluding that Plaintiff can perform sedentary work. If anything, however, Dr. Toor's opinion is more consistent with Dr. Caifano's very restrictive RFC assessment. See, e.g., Malone v. Comm'r of Soc. Sec., No. 08-CV-1249(GLS/VEB), 2011 WL 817448, at *10 (N.D.N.Y. Jan. 18, 2011) (consultative examiner's assessment that claimant had "moderate" limitation with respect to prolonged standing and sitting "suggests a possibility that prolonged standing might pose a problem"; ALJ's assessment that claimant could perform light work thus was not supported by substantial evidence), rep. and rec. adopted, 2011 WL 808378 (N.D.N.Y. 2011). Moreover, the consultative physician's assignment of "moderate to severe" limitations in standing, walking, squatting, bending, and lifting; and "moderate" limitations in sitting a long time are too vague to constitute substantial evidence that Plaintiff can perform sedentary work. See also Seignious v. Colvin, No. 6:15-CV-06065(MAT), 2016 WL 96219, at *3 (W.D.N.Y. Jan. 8, 2016) (consultative physician's "evaluation of 'moderate to severe' limitations is too vague, on its face, to constitute substantial evidence supporting the ALJ's

conclusion that [the claimant] can perform the exertional requirements of sedentary work") (citing <u>Richardson v. Astrue</u>, No. 10 Civ. 9356(DAB)(AJP), 2011 WL 2671557, at *12 (S.D.N.Y. July 8, 2011) (consultative physician's conclusion that claimant's ability to sit was "mildly to moderately" impaired provided "no support" for ALJ's conclusion that claimant could perform sedentary work) (citing <u>Curry v. Apfel</u>, 209 F.3d 117, 123 (2d Cir. 2000), <u>superceded by regulation on other grounds</u>, 20 C.F.R. § 404.1560(c)(2)); other citations and footnote omitted)).

In sum, the Court cannot discern the ALJ's rationale for weighing the above-discussed medical source statements as he did; nor can the Court determine how the ALJ reconciled these divergent opinions in his RFC assessment. Consequently, the Court is unable to determine whether the ALJ's RFC assessment is supported by substantial evidence. Remand accordingly is required. <u>See Duncan v. Astrue</u>, No. 09-CV-4462KAM, 2011 WL 1748549, at *17 (E.D.N.Y. May 6, 2011) ("An ALJ's failure to reconcile materially divergent RFC opinions of medical sources is . . . a ground for remand.") (citing <u>Caserto v. Barnhart</u>, 309 F. Supp.2d 435, 445 (E.D.N.Y. 2004) ("Dr. Rosenberg's conclusion that the plaintiff could stand for three hours, for thirty minutes at a time, sit for three hours, for twenty to thirty minutes at a time and lift ten pounds occasionally is in direct conflict with Dr. Gowd's conclusion that the plaintiff could lift up to ten pounds frequently and twenty pounds

occasionally, stand and/or walk for about six hours a day and sit
for about six hours a day in an eight hour workday. The ALJ failed
to reconcile this discrepancy and failed to specify why the
conclusion of Dr. Gowd was entitled to more weight than that of Dr.
Rosenberg."); Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)
("Since we cannot fathom the ALJ's rationale for his conclusion of
transferable skills based on the evidence in the instant record, we
direct that the ALJ on remand make more explicit his findings
regarding Ferraris' skills and their transferability.") (internal
citation and footnote omitted)).

## II. Plaintiff contends that the ALJ erroneously weighed the consultative psychologist's opinion.

On August 10, 2012, Plaintiff underwent a consultative
psychological examination by Yu-Ying Lin, Ph.D., at the
Commissioner's request. See T.284-87. Plaintiff denied any
hospitalization for psychiatric treatment or outpatient mental
health treatment; he was prescribed anti-depressant and anti-
anxiety medications by his primary care provider. Plaintiff
reported anxiety-related symptoms since 2010, including feelings of
excessive worry, easy fatigability, irritability, hyper-startle
response, restlessness, difficulty concentrating, panic attacks
twice a week, and palpitations. On exam, Dr. Lin observed that
Plaintiff had a "cooperative" demeanor and an "adequate" manner of
relating; his mood was "[n]eutral and anxious" and his affect was

"[f]ull range." Plaintiff's posture and motor behavior were normal, and he made appropriate eye contact. Dr. Lin noted that Plaintiff's attention and concentration "[a]ppeared to be mildly impaired due to anxiety in the evaluation" and "possibly limited intellectual functioning." Plaintiff recalled 3 objects immediately and 2 after delay, and he recalled 3 digits forward and 2 digits backward. He could perform simple calculations and serial 3s. T.284-85. Dr. Lin stated that Plaintiff's insight and judgment were "[g]ood." T.285.

For his medical source statement, Dr. Lin opined that Plaintiff can follow and understand simple directions and instructions, learn new tasks, perform simple and complex tasks independently, maintain attention and concentration, maintain a regular schedule, make appropriate decisions, and relate adequately with others. T.286. However, Dr. Lin stated, he "cannot deal appropriately with stress," and noted that unspecified "[d]ifficulties are caused by stress related problems." Id. Diagnoses on Axis I were adjustment disorder with mixed anxiety and depressed mood, and panic disorder (without agoraphobia). T.287. Plaintiff's prognosis was "[f]air."

The ALJ gave Dr. Lin's medical source statement "significant weight," T.31, but declined to accept his opinion that Plaintiff "cannot deal appropriately with stress." Id. The ALJ reasoned that this aspect of Dr. Lin's report was inconsistent with his finding that Plaintiff's psychiatric problems did not appear to be

significant enough to interfere with the ability to function on a
daily basis. The Court agrees that there is some ambiguity is these
two findings. As the Commissioner has recognized, "[i]ndividuals
with mental disorders often adopt a highly restricted and/or
inflexible lifestyle within which they appear to function well[,]"
SSR 85-15, 1985 WL 56857, at *5, *6 (S.S.A. 1985), but then are
unable to "adapt to the demands or 'stress' of the workplace" and
"have difficulty meeting the requirements of even so-called 'low
stress' jobs." Id.; see also Haymond v. Colvin, No. 1:11-CV-0631
MAT, 2014 WL 2048172, at *9 (W.D.N.Y. May 19, 2014). In addition,
the ALJ found an inconsistency between Dr. Lin's opinion that
Plaintiff could not deal with stress adequately, and his opinion
that Plaintiff could maintain a schedule and learn new tasks.
However, being able to learn new tasks and maintain a schedule does
not necessarily equate with being able to tolerate the normal
stressors presented by a typical competitive workplace environment.
Remand is required in order to obtain clarification from Dr. Lin
regarding these ambiguities in his report.

## CONCLUSION

For the reasons discussed above, the Commissioner's motion for
judgment on the pleadings is denied. Plaintiff's motion for
judgment on the pleadings is granted, to the extent that the
Commissioner's decision is reversed, and the matter is remanded for
further administrative proceedings consistent with this opinion. In

particular, the ALJ is directed to re-weigh Dr. Caifano's treating source opinion and Dr. Shores's other source opinion, obtain transcribed treatment notes from Dr. Shores if necessary, obtain clarification from Dr. Toor regarding his opinions as to Plaintiff's functional limitations, and obtain clarification from Dr. Lin regarding Plaintiff's ability to deal with stress in the workplace.

**SO ORDERED**

**S/ Michael A. Telesca**

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:      July 8, 2016
            Rochester, New York

-26-